# United States District Court
# Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

MAY 4, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY:        BH        DEPUTY

|  |  |
|---|---|
| Sarah Dieffenbacher<br><br>              Plaintiff,<br><br>              v.<br><br>Betsy DeVos, in her official capacity as Secretary of the United States Department of Education<br><br>              Defendant. | EDCV 17-342-VAP (KKx)<br><br>**Order GRANTING Defendant's Motion to Dismiss and DENYING Plaintiff's Motion for Summary Judgment**<br><br>**(Doc. Nos. 52 & 53.)** |

Plaintiff Sarah Dieffenbacher ("Plaintiff") filed this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. § 2201, to challenge the determination by Defendant Betsy DeVos, in her official capacity as the United States Secretary of Education ("Defendant")[1], that her wages are subject to administrative wage garnishment pursuant to 20 U.S.C. § 1095(a).  (Doc. No. 1 ("Complaint" or "Compl.") ¶ 5.)

---

[1] In this Order, "Defendant" refers to both the Secretary and the United States Department of Education.  By statute, the Secretary oversees all of the Department of Education's operations and the administration of federal student loans.  *See* 20 U.S.C. § 3411 ("The Department shall be administered, in accordance with the provision of this chapter, under the supervision and direction of a Secretary of Education."); *id.* § 1070 (requiring the Secretary "to assist in making available the benefits of postsecondary education to eligible students"); *id.* § 1082 (granting the Secretary broad powers to administer programs); *id.* § 1078 (providing for Secretary's oversight of guaranty agencies under the Federal Family Education Loan Program); *id.* § 1095(a) (providing that the Secretary "may garnish the disposable pay of an individual to collect the amount owed by the individual.").

Now before the Court are Plaintiff's Motion for Summary Judgment (Doc. No. 52) and Defendant's Motion to Dismiss for Mootness (Doc. No. 53).  The parties have timely filed Oppositions (Doc. Nos. 54 & 55), Plaintiff filed a timely Reply (Doc. No. 56), and Defendant filed her Reply late (Doc. No. 57).  After considering all papers filed in support of and in opposition to the pending Motions, and the arguments of counsel at the April 30, 2018 hearing, the Court rules as follows.

## I.  BACKGROUND

### A.  PLAINTIFF'S STUDENT LOANS

Plaintiff obtained seven Federal Family Educational Loan Program ("FFEL") loans to attend the Paralegal Associate's Degree program (the "paralegal program") at Everest College-Ontario Metro ("Everest").  (Statement of Undisputed Facts ("SUF"), Doc. No. 52-2, ¶¶ 1, 4.)  Plaintiff graduated from the paralegal program in April 2009.  (*Id.* ¶ 3.)  The FFEL loans that Plaintiff borrowed to attend this program totaled $22,521 at origin.  (*Id.* ¶ 5.)

From April 2010 to approximately July 2012, Plaintiff also attended, but did not complete, Everest's Criminal Justice Bachelor's Degree program.  (*Id.* ¶¶ 6, 9.)  To attend the criminal justice program, she borrowed six federal Direct loans, totaling $25,463 at origination, and approximately $20,000 in private student loans.  (*Id.* ¶¶ 7-8.)

When she first enrolled at Everest in 2007, Plaintiff was going through divorce proceedings and had stayed home to raise her four children.  (*Id.* ¶¶ 12-13.)  She had learned about Everest from a brochure she received in the mail

that advertised a flexible schedule and high job placement rates. (*Id.* ¶¶ 14-15.) Plaintiff was attracted to attending Everest because she needed a means to support herself and her children. (*Id.* ¶ 17.) Plaintiff believed she could start work as a paralegal while her children were school-aged and then go to law school. (*Id.* ¶ 19.)

At some point in the spring of 2007, Plaintiff met with an Everest admissions officer named Gabriela Padilla, who painted a "beautiful picture" of what Everest would be like and "how great" Plaintiff's life would be after she attended. (*Id.* ¶¶ 20-22.) Ms. Padilla told Plaintiff that her idea of completing the paralegal program and working as a paralegal while her children were in school and then going to law school after they were grown was a good plan. (*Id.* ¶ 23.) Ms. Padilla told Plaintiff that the Paralegal Associate's Degree was a great "stepping stone" towards practicing law, and that it would be easy for her to go to law school after becoming a paralegal. (*Id.* ¶¶ 24-25.) Ms. Padilla also told Plaintiff that all of her credits from Everest would be transferable to schools inside and outside of California, including the University of La Verne College of Law. (*Id.* ¶¶ 27-28.) According to Ms. Padilla, Everest's paralegal program was an "ABA-approved program" and that Everest was "nationally and regionally accredited." (*Id.* ¶¶ 29-31.) Ms. Padilla additionally told Plaintiff that Everest's flexible schedule would work well for Plaintiff as a single mother and that Everest was in the process of adding an on-campus daycare center to make it easier for parents to attend. (*Id.* ¶¶ 33-34.)

As for the program itself, Ms. Padilla told Plaintiff that the instructors for the paralegal program were all practicing attorneys who were not only "book smart," but had personal experience in the field who could provide "hands-on" training.

(*Id.* ¶¶ 35-37.)  Regarding career prospects, Ms. Padilla told Plaintiff that Everest would help her find a paralegal position after graduation, that 90% of students from the program obtained jobs in the legal field, that Everest was well-connected in the local legal community, and that students from the program "were in very high demand from local employers."  (*Id.* ¶¶ 41-45.)  Specifically, Ms. Padilla told Plaintiff that attorneys liked the ability to "mold" paralegals who graduated from Everest, because they did not have bad habits from previous jobs, and that employers would "go after" her as an Everest graduate.  (*Id.* ¶ 47-48.)  According to Ms. Padilla, the starting salary as an entry-level paralegal would be at least $55,000 per year.  (*Id.* ¶ 49.)

An Everest financial aid counselor filled out a federal financial aid application for Plaintiff and instructed her to sign it.  (*Id.* ¶ 50.)  This financial aid counselor told Plaintiff that the Paralegal Associate's Degree would cost about $5,000 after her financial aid grants were applied and that Plaintiff would be able to pay off her student loans very quickly.  (*Id.* ¶¶ 51-54.)   When she decided to sign up for the paralegal program, Plaintiff believed that Everest was a "good deal."  (*Id.* ¶ 55.)  Plaintiff believed that if Everest was funded by the federal government, it was a legitimate school that would not lie to her.  (*Id.* ¶ 57.)  She was excited at the prospect of a successful career in the legal field and signed the loan documents, although she did not fully understand them.  (*Id.* ¶¶ 55-58.)  Everest staff did not provide Plaintiff with a choice of lenders, but gave her a form that listed College Loan Corporation in pre-printed type.  (*Id.* ¶¶ 186-88.)  On April 19, 2007, Plaintiff signed a Master Promissory Note for her FFEL loans from the College Loan Corporation.  (*Id.* ¶ 185.)

4

Once she was enrolled at Everest, Plaintiff earned a 4.0 GPA her first summer, earned a President's List certificate, and graduated on the honor roll. (*Id.* ¶¶ 59-62.)  The actual program, however, was not consistent with the promised descriptions – the classes consisted of reading, doing workbooks, and watching "Law and Order" episodes.  (*Id.*)   The most "hands-on" experience was walking around a local law library, and none of the instructors were attorneys. (*Id.* ¶¶ 63-67.)

 After Plaintiff began classes, the Everest financial aid office did not tell her the exact amount she had borrowed, and she never knew what loans she had obtained while she was in the paralegal program.  (*Id.* ¶¶ 68-69.)  At one point, Everest employees pulled Plaintiff from class and called her to the financial aid office.  (*Id.* ¶ 70.)  There, the Everest employees asked Plaintiff to log in to her financial aid portal and then told her to leave the office without signing out.  (*Id.* ¶ 71.)  Unbeknownst to Plaintiff, the Everest employees then enrolled Plaintiff in more student loans without her consent.  (*Id.* ¶¶ 72-73.)

The Everest career services office did not help Plaintiff find a paralegal internship.  (*Id.* ¶ 74.)  Plaintiff applied for internships on her own initiative, and eventually found an unpaid internship at the Family Law Facilitator's Office in the San Bernardino Superior Court.  (*Id.* ¶ 76.)  Although Plaintiff started her internship, she did not finish it because she could not afford to pay for childcare and work without pay.  (*Id.* ¶ 78.)

After Plaintiff graduated from the paralegal program, Everest did not help her in her job search.  (*Id.* ¶ 82.)  When she asked for assistance, Everest employees gave her copies of craigslist advertisements.  (*Id.* ¶ 83.)  Without any

assistance from Everest, Plaintiff set up and attended over twenty paralegal job interviews, but did not receive a single callback interview.  (*Id.* ¶¶ 84-85.)  Upon learning that Plaintiff went to Everest, interviewers became visibly less interested.  (*Id.* ¶ 86.)  The law firms Plaintiff spoke with did not acknowledge her Everest paralegal degree, and big law firms were the least interested in hiring her.  (*Id.* ¶¶ 87-88.)  Plaintiff looked for a paralegal job on her own for almost a year.  (*Id.* ¶ 92.)

Plaintiff also began looking into transferring her Everest credits to another school to start a law degree.  (*Id.* ¶ 90.)  In the summer of 2009, Plaintiff briefly attended a psychology and criminal justice program at Argosy University.  (*Id.* ¶ 93.)  She started this program when she realized that finding a paralegal job would be difficult.  (*Id.* ¶ 94.)  She had to drop out of the Argosy program, however, because Argosy told her that Everest had used up her financial aid and she could not afford to pay the tuition without assistance.  (*Id.* ¶ 95.)  Argosy would not accept most of Plaintiff's Everest credits, but suggested to Plaintiff that she return to Everest because Everest would accept her credits.  (*Id.* ¶¶ 96-97.)

Less than a year after she graduated from the paralegal program, Plaintiff spoke with an Everest representative about her trouble finding a paralegal job.  (*Id.* ¶ 98.)  The representative told her "[a]n associate's degree is like a high school degree these days.  It is just so common," and that a bachelor's degree was worth more than an associate's degree.  (*Id.* ¶¶ 99-100.)  The representative suggested that Plaintiff obtain a bachelor's degree in Criminal Justice from Everest, which would provide her with more opportunities and allow her to go into criminal law, telling her that "[w]ith two degrees, you'll be way ahead and in high demand."  (*Id.* ¶¶ 102-104, 106.)  The representative also told Plaintiff that the

Criminal Justice Bachelor's Degree program ("the criminal justice program") would be hands-on, with "real-life" scenarios involving crime scenes and mock investigations.  (*Id.* ¶ 105.)  As for the practicality of enrolling in the criminal justice program, the representative told Plaintiff that many of the courses from her paralegal degree would count towards the prerequisites of the bachelor's degree, and that it would only take her a year and a half to finish the bachelor's degree.  (*Id.* ¶¶ 108-110.)  The brochure for the criminal justice program listed favorable job placement rates that Plaintiff ultimately found convincing.  (*Id.* ¶¶ 112-113.)

When Plaintiff began discussions with the Everest financial aid office about financing the bachelor's degree, the Everest representatives told her she qualified for a new set of Pell grants, and that the criminal justice program would cost half the amount of the paralegal program because she had already completed many of the prerequisites through her associate's degree.  (*Id.* ¶¶ 115-119.)  At the time, Plaintiff was desperate to find a job and anxious about her loans.  (*Id.* ¶ 120.)  She also wanted to attend law school, as she had originally planned.  (*Id.* ¶ 121.)  As other schools would not accept the Everest credits, Plaintiff decided to re-enroll at Everest in the criminal justice program.  (*Id.* ¶¶ 122-23.)

While Plaintiff was enrolled in the criminal justice program, Everest financial aid staff pulled her out of class at the end of the term to sign into the student portal and signed her up for more loans without her knowledge.  (*Id.* ¶ 126.)

After Plaintiff completed three terms in the criminal justice program, an Everest administrator told her that the school had made an "oversight" about the prerequisites, and that she would be required to attend for another term. (*Id.* ¶¶ 128-130.)  Although Plaintiff was frustrated at the mistake, she agreed to complete one more term.  (*Id.* ¶ 131.)  After the next term, the administrator told her there was another mistake and that she was required to take classes for an additional term.  (*Id.* ¶ 132.)  At this point, Plaintiff realized that Everest was "playing her for a fool," and called Denise Greco, the campus dean, to complain. (*Id.* ¶¶ 133-34.)  Ms. Greco responded by telling Plaintiff not to give up because she was "almost there."  (*Id.* ¶ 135.)  Plaintiff was exhausted and angry, as she had been raising her children and going to school for four years, and had "nothing to show for it."  (*Id.* ¶ 137.)  She withdrew from the criminal justice program in approximately July 2012.  (*Id.* ¶ 138.)  After withdrawing, she never heard from Everest again, and she continued to look for jobs in the paralegal and criminal justice fields without success.  (*Id.* ¶¶ 139-141.)  Plaintiff never found employment in the legal field.  (*Id.* ¶ 143.)

Plaintiff first learned the full extent of her student loans in 2012 when she tried to buy a car.  (*Id.* ¶ 147.)  She was shocked.  (*Id.* ¶ 148.)  As a result of the student debt she incurred from attending Everest, she has not been able to obtain funding to pursue further education and cannot afford further schooling. (*Id.* ¶ 150-151.)  According to Plaintiff, Everest has "shattered" her career goals, as her course credits from Everest are essentially useless.  (*Id.* ¶¶ 149, 152-53.)

By November 2016, Plaintiff's student debt from Everest, including her federal and private loans, totaled almost $100,000.  (*Id.* ¶ 11.)  Her inability to repay these student loans has harmed her consumer credit rating, resulted in her

only qualifying for a "high risk" loan for a car, and causes her "constant stress." (*Id.* ¶¶ 156-57, 160.)

Plaintiff eventually was able to find employment as a full-time home healthcare phlebotomist.  (*Id.* ¶ 230.)

### B.   ADMINISTRATIVE PROCEEDINGS

Everest was operated by Corinthian Colleges, Inc. ("Corinthian").  (*Id.* ¶ 189.)  Everest maintained loan applications for FFEL loans with College Loan Corporation on site.  (*Id.* ¶ 187.)  College Loan Corporation maintained a lender agreement with Corinthian between 2007 and 2008.  (*Id.* ¶ 190.)  This agreement covered all of Corinthian's campuses nationwide, including Everest.  (*Id.* ¶ 191.)  Under this lender agreement, College Loan Corporation provided private student loans to Corinthian schools, including Everest.  (*Id.* ¶ 193.)

On March 28, 2015, Plaintiff, acting *pro se*, submitted a Borrower Defense to Repayment application to Defendant, seeking a full discharge of the federal student loans she obtained to attend Everest, asserting that these loans are not legally enforceable because of Everest's misconduct.  (*Id.* ¶ 194; AR at 178-87.)  At some point before October 31, 2016, College Loan Corporation transferred Plaintiff's FFEL loans to Educational Credit Management Corporation ("ECMC"). (SUF ¶ 195; AR at 176-77.)

On October 19, 2016, ECMC sent Plaintiff a notice of proposed wage garnishment for three of the FFEL loans that she had taken out to enroll in Everest's paralegal program.  (SUF ¶ 196; AR at 10-11, 127-33.)  This notice stated that these loans totaled $14,122.14 and informed Plaintiff of her right "to

request a hearing, within 30 days of this Notice, for any objection regarding the existence, amount, or enforceability of these loan(s)."  (SUF ¶¶ 197-198; AR at 127.)  The notice included a form to request a hearing.  (SUF ¶ 199; AR at 7.)

On November 2, 2016, Plaintiff, through counsel, submitted a Borrower Defense to Repayment application ("borrower defense application") to ECMC challenging the proposed wage garnishment and included a completed "Request for Hearing or Exemption" form.  (SUF ¶¶ 200-01; AR at 10-36.)  On the form, Plaintiff selected, "I want an in-person hearing."  (SUF ¶ 203; AR at 7.)  Plaintiff also marked as her "Reason[] Why You Object To Garnishment," that "I believe this loan(s) is not an enforceable debt in the amount stated for the reasons explained in the attached letter."  (SUF ¶ 202; AR at 7.)  Plaintiff attached a 29-page letter explaining why she believed all of her loans to be unenforceable. (SUF ¶ 204; AR at 10-36.)  The letter presented arguments that Everest's violations of California law constitute a complete defense to repayment of her loans – specifically, the Consumer Legal Remedies Act, section 1750 *et seq.* of the California Code of Civil Procedure, the Unfair Competition Law, section 17200 of the California Business & Professions Code, negligent misrepresentation, and fraud.  (*Id.* ¶¶ 206-207; AR at 10-36.)  The letter explained that these violations constitute a complete defense to repayment of Plaintiff's federal student loans from Everest and that Plaintiff is entitled to a full discharge of her loans, as well as other relief.  (*Id.* ¶ 209.)  In support of her borrower defense application, Plaintiff submitted 254 pages of exhibits.  (*Id.* ¶ 217.)

In December 2017, ECMC referred Plaintiff's objection and hearing request to Defendant for adjudication.  (*Id.* ¶ 223; AR at 6.)

On January 30, 2017, Defendant issued an Administrative Wage Garnishment Hearing Decision (the "AWG Decision") denying Plaintiff's objections to the legal enforceability of her loans and authorizing wage garnishment.  (SUF ¶ 224; AR at 3-5.)  The letter states:

> This letter is to present the findings of the recent written records hearing requested by you on behalf of your client [sic] objection to collection of a defaulted student loan account held by the Educational Management Corporation (ECMC) through wage garnishment action.  This decision was rendered by the U.S. Department of Education (the Department) after careful review of your argument and all available records related to your client's account, including those submitted by you and those maintained by ECMC.  These findings are conclusive and represent the Department's final decision on your client [sic] objections.  If you disagree with this decision, you may have this decision reviewed by bringing a lawsuit in Federal District Court.

(SUF ¶ 225; AR at 3.)  The letter identifies the "Evidence Considered" as "[f]ile documents provided by ECMC."  (SUF ¶ 226; AR at 3.)  According to the letter, the Department determined that the loans were "still legally enforceable" and that Plaintiff's "account is subject to collection through administrative wage garnishment (AWG) at 15% of disposable pay."  (SUF ¶ 227; AR at 3).)  The "Reason for the Decision," as stated in the letter, is as follows:

> Your client objected that she believe [sic] that her loans are not enforceable debts [sic].  On November 14, 2016, ECMC explained to you and your client why these loans were enforceable and they had addressed your concerns and enclosed copy [sic] of the borrower's promissory notes.  Because ECMC holds the promissory note(s) and other records supporting the existence of the debt, the borrower has the burden to prove the debt is not owed.  The promissory note that forms the basis of this debt is a contract between the borrower and the lender, and any subsequent holder of the promissory note. Please have the borrower establish a repayment arrangement to

11

> avoid the possibility of wage garnishment with ECMC's Internal
> Collection Department at 800-367-1589, whereas the Department
> finds the borrower [sic] student loan debt is still legally enforceable;
> therefore the borrower [sic] objection is denied.

(SUF ¶ 228; AR at 4.)  The letter also specifies that its determination regarding
garnishment "only affects the accounts held by ECMC and has no bearing on any
other educational obligations your client may be responsible for."  (AR at 5.)

## C.   FEDERAL COURT PROCEEDINGS

Plaintiff filed this suit on February 23, 2017.  (Doc. No. 1.)  Plaintiff also
filed an application for a temporary restraining order ("TRO"), seeking to enjoin
Defendant from ordering the garnishment of her wages. (Doc. No. 2.)

On March 3, 2017, the parties stipulated to a withdrawal of Plaintiff's
application for a TRO.  (Doc. No. 11.)  Alongside this stipulation, they filed a letter
from ECMC to Plaintiff's employer ordering "suspen[sion] of garnishment … until
further notice" and further stating that the garnishment order "does not expire"
and continues to exist on this individual."  (Doc. No. 11-1.)  The Court approved
the stipulation on March 7, 2017.  (Doc. No. 18.)

On May 8, 2017, Defendant filed a motion for voluntary remand so she
could "reconsider and re-issue" the challenged wage garnishment decision within
90 days "in a way that would not be arbitrary, capricious, or contrary to law."
(Doc. No. 25 at 4.)

On June 9, 2017, the Court issued an order denying Defendant's Motion
for Voluntary Remand, finding the request to be both frivolous and in bad faith.
(Doc. No. 31.)  The Court also held the matter in abeyance to afford Defendant

an opportunity to make a final determination as to Plaintiff's loan cancellation application and ordered Defendant to file a status report with the Court within ninety days.  (*Id.* at 7.)  The Court's order indicated that if Defendant failed to issue a final decision as to Plaintiff's loan cancellation application within those ninety days, the Court would proceed to consider the issue of enforceability on the merits.  (*Id.*)

On June 15, 2017, Defendant issued an Interim Decision withdrawing the AWG Decision (the "Interim Decision").  (AR at 1-2.)  The Interim Decision states, in relevant part:

> The January 30, 2017 decision failed to consider the application, dated March 28, 2015, that your client had filed to discharge her loans on the basis of borrower defense to repayment, which remained pending with the Department at the time the January 30, 2017 decision was issued.  Because the January 30, 2017 decision did not consider all the relevant factors, it is hereby withdrawn. No AWG is authorized on loans held by the Department while the borrower discharge application remains pending.
>
> **CONSEQUENCES OF THE DECISION AND FURTHER RIGHTS:**
> The student loans your client took pursuant to the FFEL student loan program that were previously held by ECMC have been assigned to the Department.  All of these loans, as well as student loans already held by the Department, are currently in administrative forbearance, which means that no payment is due.  No wage garnishment on these loans will be initiated until review of [Plaintiff]'s borrower defense application is complete.  The Department will await the final resolution of [Plaintiff]'s borrower defense claim by the Borrower Defense group, before issuing a final decision addressing your client's claim that her loans are not enforceable debts. The Department will issue a final administrative wage garnishment hearing decision as soon as the review of all of [Plaintiff]'s objections has been completed.

(*Id.* at 2.)  The Interim Decision also indicates that it considered Plaintiff's *pro se* Borrower Defense application in addition to file documents provided by ECMC. (*Id.* at 1.)

On September 7, 2017, Defendant filed her status report.  (Doc. No. 32.) Therein, she indicated that on June 15, 2017, she withdrew the challenged AWG Decision by issuing the Interim Decision "on the grounds that [she] failed to consider the pending application for discharge of student loan debt."  (*Id.* at 2.) She further indicated that Plaintiff's application for discharge of the underlying student loan debt remained pending, and that a decision on Plaintiff's discharge application would issue within six months (on or before March 1, 2018) as part of a larger group of decisions being issued on similar claims.  (*Id.* at 2-3.)

On September 13, 2017, Plaintiff filed a response to Defendant's status report.  (Doc. No. 36.)  Therein, Plaintiff requested that the Court "proceed as expeditiously as possible to consider the merits of Plaintiff's objection to the enforceability of her student loans," noting that Defendant "has failed to issue a conclusive ruling as to the enforceability of [Plaintiff]'s loans," and that Defendant's claim that it would issue a final decision within six months is "specious in light of its previous conduct, both in the prosecution of this litigation and otherwise," and pointing out that Defendant "has neither been forthcoming nor candid in its previous representations to this Court and Plaintiff."  (*Id.* at 2-3.) Plaintiff further claimed that Defendant's June 15, 2017 decision that withdrew its AWG Decision is "yet another blatant attempt on the part of Defendant to evade judicial scrutiny of its failure to discharge Plaintiff's loans."  (*Id.* at 3.)

On September 22, 2017, the Court ordered the parties to show cause why this case should not be dismissed for lack of subject jurisdiction.  (Doc. No. 37.) Upon review of the timely filed responses (Doc. Nos. 38 & 39), the Court determined it had jurisdiction and ordered Defendant to file an Answer or responsive pleading.  (Doc. No. 40.)  Defendant filed her Answer on November 20, 2017.  (Doc. No. 41.)

The parties subsequently indicated their intent to resolve the case by cross-motions for summary judgment on the administrative record.  (*See* Doc. No. 46.)  They timely filed their respective motions on April 2, 2018.  (Doc. Nos. 52 & 53.)

## II.   MOTION TO DISMISS

The Court first addresses Defendant's Motion, as it concerns the Court's subject matter jurisdiction over this case.

### A.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. Fed. R. Civ. P. 12(b)(1).  A complaint will be dismissed under Rule 12(b)(1) if, among other things, there is no "case or controversy" within the meaning of that constitutional term. *Baker v. Carr*, 369 U.S. 186, 198 (1962).  A party seeking to invoke federal jurisdiction bears the burden of establishing that jurisdiction exists "for each claim he seeks to press" and for "each form of relief sought."  *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  The burden rests on the plaintiff to prove standing "with the manner and degree of evidence required at the

successive stages of litigation." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  If jurisdiction is challenged at the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice because [courts] presume that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)) (internal quotation marks omitted); *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (noting that when deciding a 12(b)(1) motion courts "assume [plaintiff's] [factual] allegations to be true and draw all reasonable inferences in his favor.") (alterations in original).

Although the default standard for a Rule 12(b)(1) motion made at the pleading stage is to accept the plaintiff's allegations as true, limited exceptions exist.  Relevant here is the exception created by the distinction between "facial" and "factual" attacks on subject matter jurisdiction.  *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  A facial attack accepts the factual allegations as pleaded, but "asserts that [they] are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A factual attack, in contrast, "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  Here, as Defendant does not contest the truth of the allegations in the Complaint, her Motion is a facial attack that the Court resolves "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient to invoke the court's jurisdiction."  *Leite*, 749 F.3d at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

**B.**   **DISCUSSION**

Defendant argues that the withdrawal of the AWG Decision renders Plaintiff's APA claim moot and there is now no longer a justiciable claim before this Court.  (Doc. No. 52 at 5-6.)  According to Defendant, there is no operative administrative wage garnishment decision that amounts to a "final agency action" within the meaning of the APA, and "any potential future garnishment would be limited to only student loan debt already determined by [Defendant] to be legally enforceable." (*Id.* at 6.)  In support of her Motion, Defendant filed the sworn declaration of Jane Bryson, Supervisory Management and Program Analyst at the Department, whose responsibilities include supervising federal student loan discharge application processing.  (Doc. No. 53-1.)  Ms. Bryson states that on February 28, 2018, Defendant issued an Adjudication Notice decision (the "Adjudication Notice") in connection with Plaintiff's March 28, 2015 application for discharge of her loans on the basis of borrower defense.  (*Id.*)  A true and correct copy of the Adjudication Notice, attached to the Motion, reflects that Defendant approved Plaintiff's claim for forgiveness of her federal student loans under the borrower defense to repayment rule, 34 C.F.R. § 685.206(c), and that fifty percent of the Federal Student Aid loans Plaintiff received for the two Everest programs of study are eligible for discharge.  (Doc. No. 53-2.)

According to the "classic formulation" of mootness doctrine, in order for a controversy to be justiciable, it "must be definite and concrete, touching the legal relations of parties having adverse legal interests.  It must be a real and substantial controversy, admitting of a specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *West v. Secretary of Dept. of Transp.* 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Aetna Life Ins. Co. v. Haworth*,

300 U.S. 227, 240-41 (1937)).  In administrative law cases, generally, "when an administrative agency has performed the action sought by a plaintiff in litigation, a federal court 'lacks the ability to grant effective relief,' and the claim is moot." *Rosemere Neighborhood Ass'n v. U.S. Environmental Protection Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (citing *Pub. Util. Comm'n v. FERC*, 100 F.3d 1451, 1458 (9th Cir.1996)).  "[M[ootness inquiries … require courts to look to changing circumstances that arise after the complaint is filed … If a 'live' controversy no longer exists, the claim is moot."  *Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)); *see also West*, 206 F.3d at 925 (internal quotations omitted) (emphasis in original) ("[I]n deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available.  The question is whether there can be *any* effective relief.").  The Ninth Circuit has held that "[t]he burden of demonstrating mootness is a heavy one."  *Northwest Envt'l Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988).

The AWG Decision issued on January 30, 2017 is no longer enforceable, as it predates the Adjudication Notice, and purported to enforce collection of the full amount of three of Plaintiff's FFEL loans.  During the course of this litigation, Defendant withdrew the AWG Decision, but in any case, the Adjudication Notice, which granted Plaintiff relief from fifty percent of her student loan debt necessarily invalidated it.

Moreover, as defense counsel pointed out at the hearing on this Motion, an examination of Plaintiff's narrowly pled complaint reveals that she has now obtained the relief she sought.  The Complaint alleged that she filed suit "to set

18

aside the Department [of Education]'s decision [denying her borrower defense claims and authorizing administrative wage garnishment]."  (Compl. ¶¶ 4-5.)  Her prayer for relief sought a finding that the AWG decision violated the Administrative Procedure Act, an order striking or setting aside the AWG decision, an order that the Defendant withdraw authority for the AWG decision, and ordering the Defendant to provide her a hearing to present evidence regarding her challenge to the legal enforceability of her debt.  (*Id.* at 12-13.)

In other words, the now-withdrawn -- and defunct -- AWG Decision was the "sole basis" upon which Plaintiff sought APA review.  (*See* Doc. No. 57 at 2.) Plaintiff filed her suit on February 23, 2017, and "did not – and could not – challenge the DOE decision about the legal enforceability of her student loan debt issued on year later on February 28, 2017."  (*Id.*)

Plaintiff urges the Court to adopt a broader interpretation of the relief she sought in the Complaint, and points to the allegations describing Everest's misconduct in relation to her student loan debt.  The detailed factual allegations regarding Everest's misconduct do not overcome the plain wording regarding the narrowly-tailored relief sought, however.

To the extent Plaintiff argues that the Complaint could apply to any future wage garnishment by Defendant on the fifty percent of her loans that Defendant has determined to be enforceable, the Court disagrees.  Any future wage garnishment based on the Adjudication Notice would be distinct from the previous wage garnishment order upheld by the withdrawn AWG Decision and cannot be challenged in this suit.  Were the Court to extend the Complaint's reach to the Adjudication Notice, it would in effect be providing "an opinion

advising what the law would be upon a hypothetical state of facts." *West,* 206 F.3d at 924.

Defendant has met her burden of demonstrating that this case is now moot.  *Gordon*, 849 F.2d at 1244.  Accordingly, the Court GRANTS Defendant's Motion.  The Court DENIES AS MOOT Plaintiff's Motion.

### III.    CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion to Dismiss and DENIES Plaintiff's Motion for Summary Judgment as moot. Judgment shall be entered in favor of Defendant.

**IT IS SO ORDERED.**

Dated:    5/4/18

Virginia A. Phillips
Chief United States District Judge