DEANNE B. LOONIN (SBN 156733)
dloonin@law.harvard.edu
EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tomerrill@law.harvard.edu
JOSHUA D. ROVENGER (*Pro Hac Vice Application Forthcoming*)
jrovenger@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

ROBYN C. SMITH (SBN 165446)
rsmith@lafla.org
LEGAL AID FOUNDATION OF LOS
ANGELES
5228 Whittier Blvd.
Los Angeles, CA 90022
Tel.: (213) 640-3906
Fax: (213) 640-3911

*Attorneys for Plaintiff*
SARAH DIEFFENBACHER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH DIEFFENBACHER,<br><br>        *Plaintiff*,<br><br>    v.<br><br>BETSY DEVOS, in her official capacity as Secretary of the United States Department of Education,<br><br>        *Defendant*. | Case No.: 17-cv-342-VAP-KK<br><br>**FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]** |

1

# INTRODUCTION

1.      Plaintiff Sarah Dieffenbacher borrowed federal student loans to attend Everest College, a school operated by Corinthian Colleges, Inc.

2.      Despite owing over $100,000 in student loans, Plaintiff lost far more than she gained (which was nothing) from her experience at Everest.

3.      Beginning in 2015, Plaintiff has repeatedly challenged the enforceability of her loans.

4.      On four separate occasions, she has asserted to the Defendant, the Secretary of the United States Department of Education,[1] that she has a complete defense to the repayment of these loans, under the loan terms and federal law, based on Everest's commission of multiple violations of California law.

5.      Over her objections, the Department attempted to collect her student loans by garnishing her wages, and has otherwise maintained that her loans are in fact enforceable.

6.      After Plaintiff sued to stop garnishment, the Department engaged in frivolous and bad faith litigation conduct to delay resolution of Plaintiff's claims.

7.      One year after Plaintiff initiated this lawsuit, and three years after she submitted the first of four borrower defense claims, the Department issued a "Notice of Adjudication," purporting to recognize that Plaintiff has a cognizable defense to the repayment of all of her student loans, but nonetheless determining that her loans are still enforceable.

8.      To date, the Defendant has not explained its final determinations—the denial of her legal enforceability objection to wage garnishment in January 2017, and the February 2018 Notice of Adjudication—in relation to the evidence that Plaintiff has submitted demonstrating that she has a complete defense to the

---

[1] Plaintiff refers to "the Department," "the Secretary," and "Defendant" interchangeably throughout this pleading.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

repayment of her federal student loans, under the terms of those loan notes and Department regulations.

9.   Instead, the Department utilized a murky, convoluted, unfair, and irrational process designed to minimize relief.  It used information about Plaintiff and other applicants that was illegally obtained from the Social Security Administration ("SSA") to compare the "average earnings" of Corinthian borrowers with the "average earnings" of borrowers who attended a "peer" school with a "passing gainful employment (GE) program."  Based on that data experiment, the Department denied Plaintiff the full loan discharge that she is due.

10.   Plaintiff remains subject to collection, including pursuant to the garnishment order issued in 2017, on loans that the Department has arbitrarily and capriciously determined are enforceable.

11.   The existence of her federal student loans, despite the evidence she has submitted to the Department of their nonenforceability, inflicts injury on Plaintiff every day.

12.   Plaintiff brings this lawsuit to set aside the Secretary's determinations as in violation of the Administrative Procedure Act, the Privacy Act, and the Due Process Clause of the United States Constitution, and to obtain a declaration that her loans are completely unenforceable and must be discharged.

## JURISDICTION AND VENUE

13.   This Court has jurisdiction over this claim under the Administrative Procedure Act, 5 U.S.C. § 702, and the Privacy Act, 5 U.S.C. § 552a, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-2202.

14.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred, and Plaintiff resides, in this district.

3

# PARTIES

15.   Plaintiff Sarah Dieffenbacher resides in Wildomar, County of Riverside, California. She works at Independent Phlebotomy Provider Group, LLC ("IPPG") in Rancho Cucamonga, County of San Bernardino, California.

16.   Defendant Betsy DeVos is the Secretary of the United States Department of Education ("Department"). In her official capacity, the Secretary of Education oversees all operations of the Department of Education and the administration of the federal student loan programs. This oversight extends to the administration of the Federal Family Education Loan ("FFEL") and Direct Loan programs, involuntary collection through administrative wage garnishment thereunder, and adjudication of borrower defense loan cancellation claims.

## STATUTORY AND REGULATORY FRAMEWORK

### *Secretary's Authority over FFEL and Direct Loan Program*

17.   Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099, provides the statutory authorization for federal student loans, including the Federal Family Education Loan ("FFEL") and Direct Loan programs, *id.* § 1071 *et seq.*

18.   The Secretary of Education ("Secretary") oversees and is responsible for federal student loan programs. *See* 20 U.S.C. § 1070.

19.   Under the Direct Loan program, the federal government directly issues student loans. *See* 20 U.S.C. § 1087a.

20.   Under the FFEL program, private lenders issued student loans, which were then insured by guaranty agencies and in turn reinsured by the Department. *Id.* § 1078(b)-(c).[2]

---

[2] No new loans can be made under the FFEL program, effective July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-151, § 2201 *et seq.*, 124 Stat. 1074 *et seq.* (2010).

4

21.     A guaranty agency is "[a] state or private nonprofit organization that has an agreement with the Secretary under which it will administer a loan guarantee program under the Act." 34 C.F.R. § 682.200.

22.     The Secretary has promulgated regulations that dictate certain procedures that guaranty agencies must follow in administering FFEL loans. 34 C.F.R. Part 682, Subpart D.

23.     Once a FFEL borrower defaults on a loan, the lender (or holder) of the loan may make a claim on the defaulted loan to the guaranty agency. The guaranty agency in turn can seek reimbursement from the Secretary for amounts paid to the lender or holder of the defaulted loan. After the guaranty agency makes reasonable attempts to collect on the defaulted loan, it may assign the loan to the Secretary for further collection.

### ***Administrative Wage Garnishment***

24.     Administrative wage garnishment is a means of involuntary collection of a past-due debt owed to an agency of the federal government. The Secretary is authorized to collect federal student loans by means of administrative wage garnishment, 20 U.S.C. § 1095a; 31 U.S.C. § 3720D(a), but only if following procedures prescribed by Congress, *see* 20 U.S.C.§ 1095a(a); 31 U.S.C. § 3720D(b).

25.     The HEA requires that a borrower under either the FFEL or Direct Loan program be afforded "a hearing . . . on the determination of the Secretary or the guaranty agency, as appropriate, concerning the existence or the amount of the debt," 20 U.S.C. § 1095a(a)(5).

26.     Among other duties, "[a] guaranty agency must initiate administrative wage garnishment proceedings against all eligible borrowers" with defaulted FFEL loans, subject to limited exceptions not at issue here. *See* 34 C.F.R. § 682.410(b)(6)(vi).

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

27.    The Department has promulgated regulations that govern administrative wage garnishment under both the FFEL and Direct Loan programs. *See* 34 C.F.R. §§ 34.1–.30; 34 C.F.R. § 682.410.

28.    At least 30 days prior to any administrative wage garnishment, a guaranty agency must provide written notice of its intent to garnish. 34 C.F.R. § 682.410(b)(9)(i)(A). This written notice must include an explanation of the borrower's rights and applicable deadlines. *Id.* § 682.410(b)(9)(i)(B). The form of notice is approved by the Secretary.

29.    A final administrative wage garnishment order consists of a final decision rejecting any objection asserted by a borrower, and a garnishment or withholding order, issued by the Secretary or guaranty agency to the borrower's employer.

30.    The guaranty agency must offer an opportunity for a hearing on any "any objection regarding the existence, amount, or enforceability of the debt," 34 C.F.R. § 682.410(b)(9)(i)(E)(1).

31.    If a borrower submits a written request for a hearing within 30 days of receiving notice, "the guaranty agency may not issue a withholding order until the borrower has been provided the requested hearing and a decision has been rendered." 34 C.F.R. § 682.410(b)(9)(i)(G).

32.    A borrower who requests a hearing in writing is entitled to a hearing and to elect between an oral and written hearing. 34 C.F.R. § 82.410(b)(9)(i)(E)(2). An oral hearing may, at the borrower's option, be conducted either in-person or by telephone conference. 34 C.F.R. § 682.410(b)(9)(i)(E)(2).

33.    According to the Secretary's manual on administrative wage garnishment, a decision on a borrower's objection to garnishment must be based on evidence presented and applicable laws and regulations. The hearing official must make an independent, *de novo* determination on questions of law and fact raised by borrower objections to the existence, amount, and enforceability of the debt.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

34.     "[U]nder no circumstances" may a hearing be conducted by someone under the supervision or control of the guaranty agency. 34 C.F.R. § 682.410(b)(9)(i)(I).

35.     Once issued, a garnishment or withholding order remains in effect until the Secretary or guaranty agency rescinds the order or the debt is fully paid, including interest, penalties and collection costs. 34 C.F.R. § 682.410(b)(9)(i)(O); *accord* 34 C.F.R. § 34.26.

36.     The Secretary and guaranty agency have the right to take legal action against an employer in order to enforce a withholding or garnishment order. 20 U.S.C. § 1095a(a)(6).

37.     A decision on a borrower's objection to administrative wage garnishment is subject to judicial review based on the administrative record. *See, e.g.,* 78 Fed. Reg. 45618, 45645 (July 29, 2013) (explaining requirements of 34 C.F.R. § 682.410(b)(9)(i)(J)); 34 C.F.R. §34.17(b).

38.     Direct Loan regulations provide that a borrower may seek reconsideration of a decision on an objection to AWG only on grounds that a borrower's financial circumstances have materially changed, or because the borrower submits evidence not previously submitted demonstrating that reconsideration is warranted. 34 C.F.R. § 34.12.

### ***Challenge to Legal Enforceability of Debt Based on School Misconduct***

39.     By regulation, a holder of a FFEL loan is "subject to all claims and defenses that the borrower could assert against the school with respect to that loan" if a sufficiently close relationship existed between the school and the lender. 34 C.F.R. § 682.209(g).

40.     Since approximately 1994, every FFEL loan has been governed by a Master Promissory Note ("MPN") that contains similar language, providing that the borrower is entitled to assert, as a defense to repayment of the loan, "all claims

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

and defenses that the borrower could assert against the school" with respect to the loan.

41.    Similarly, a Direct Loan regulation provides that "in any proceeding to collect" a loan, "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). The regulation specifically identifies wage garnishment proceedings under Section 488A of the Higher Education Act (codified at 20 U.S.C. § 1095a). *Id.* § 685.206(c)(1)(ii).

42.    The Department determined in 2015 that the California Unfair Competition Law, Business and Professions Code §§ 17200, is the "applicable" law for borrower defense claims of former Corinthian students.

43.    All Direct loans are governed by a MPN with borrower defense language:

> In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law.

44.    Direct loans and FFEL loans have the same terms, conditions, and benefits. HEA § 455(a)(1), 20 U.S.C. § 1087e(a)(1).

45.    The Department has stated that borrower rights to assert defenses to loan repayment based on school misconduct are coextensive between the FFEL and Direct Loan program. *See, e.g.,* 60 Fed. Reg. 37768, 37769–70 (Jul. 21, 1995).

46.    The Department has indicated that "borrowers have a right to submit defense to repayment claims," and that procedural processes are needed to

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

"preserv[e] borrowers' rights." *See, e.g.,* 80 Fed. Reg. 32944, 32945 (June 10, 2015).

47.     A borrower defense relieves the borrower "of the obligation to repay all or part of the loan and associated costs and fees." 34 C.F.R. § 685.206(c)(2). The Secretary is empowered to provide "further relief," which may include, without limitation, "[r]eimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection," "[d]etermining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act," and "[u]pdating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan." *Id.*

48.     The text of the regulation tethers the borrower defense remedy to the amount of relief the borrower would receive under the "cause of action against the school under applicable state law." 34 C.F.R. § 685.206(c)(1). For over two decades, and at least until January 19, 2017, the Department of Education has employed this textual interpretation of the borrower defense regulation and has tied the borrower defense remedy to the state law cause of action.

### *"Gainful Employment"*

49.     The HEA allows institutions of higher education to participate in federal student aid programs with conditions. A proprietary institution (*i.e*, one that is operated as a for-profit business) is eligible to participate in Title IV programs to the extent that it provides "an eligible program of training to prepare students for gainful employment in a recognized occupation[.]" 20 U.S.C. § 1002(b)(1)(A)(i); *see also* 20 U.S.C. § 1088(b)(1)(A)(1).

50.     Vocational institutions and non-degree programs at public or non-profit institutions may only receive Title IV funding for "gainful employment" programs as well. 20 U.S.C. § 1002(c)(1)(A).

51.     The Department's regulations set forth metrics by which it determines whether in fact a program prepares students for gainful employment.  34 C.F.R. Part 668, Subpart Q ("gainful employment regulation").  This regulation has an extensive history, but in its present iteration, it establishes accountability metrics based on the ratio of student loan debt of a cohort of students from a specific program upon leaving or completing the program, to the earnings of that same cohort two years later ("D/E Metrics").  *See* 34 C.F.R. § 668.404.   Programs that do not pass the thresholds of these metrics for several years in a row face termination from participation in Title IV.  34 C.F.R. § 668.410.

52.     The discussion of the statutory, regulatory, and statistical basis for the GE Metrics occupies over two hundred pages in the Federal Register.  Department of Education, Final Rule, Program Integrity: Gainful Employment, 79 F.R. 64890 (Oct. 31, 2014).  The purpose of the rule, and the specific calculations mandated thereunder, is "to assess whether a GE program has indeed prepared students to earn enough to repay their loans, or was sufficiently low cost, such that students are not unduly burdened with debt, and to safeguard the Federal investment in" higher education. 79 Fed. Reg. 64891.

53.     In order to calculate the D/E Metrics, the Department requires institutions to report information on an annual basis, including information needed to identify the student and institution, the program the student attended, the total amount of private and institutional debt incurred by the student, and the total amount of tuition and fees assessed against the student. 34 C.F.R. § 668.411. After the institution is given an opportunity to correct the list compiled by the Department, the Department submits the list to the Social Security Administration (SSA).  34 C.F.R. § 668.405(d).

54.     SSA returns to the Department the mean and median annual earnings of the students on the list whom SSA has matched to SSA earnings data, "in aggregate and not in individual form," and "the number, but not the identities, of

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

students on the list that SSA could not match." *Id*.  SSA compares the social security numbers provided by the Department with earnings records in its Master Earnings File (MEF), a database that includes earnings reported by employers to SSA, and also by self-employed individuals to the Internal Revenue Service, which are then relayed to SSA. *See* 79 Fed. Reg. 64950.

55.    The Department has entered into an agreement with SSA pursuant to which this information is exchanged.

56.    The information provided by SSA to the Department must be aggregate, not individual, because SSA is barred by statute from disclosing the kind of personal data that would identify the wage earners and from disclosing their reported earnings, absent specific authorization in the Internal Revenue Code. 20 U.S.C. § 6103(a).

57.    Relatedly, Congress has barred the Department from developing, implementing, or maintaining a database of personally identifiable information outside of specific circumstances.  20 U.S.C. § 1015c ("Student Unit Record Rule").

58.    In recognition of this prohibition, the 2014 gainful employment regulation restricted the scope of the data institutions must report to the Department to only such data "as needed to make a programmatic eligibility determination[.]"  79 Fed. Reg. 64976.

### ***The Privacy Act***

59.    Congress adopted the Privacy Act, 5 U.S.C § 552a, to "protect the privacy of individuals identified in information systems maintained by Federal agencies."  The Law "regulate[s] the collection, maintenance, use, and dissemination of information by such agencies," in order to avoid "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." § 552a(e)(10).

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

60.   In the 1980's, executive agencies were increasingly sharing individuals' personal information for the purposes of deciding or verifying individual eligibility for federal benefits.  Congress accordingly amended the Privacy Act to regulate "computer matching" or the "establishing or verifying eligibility for a Federal benefit program."  *See* Pub. Law. 100-503, The Computer Matching and Privacy Protection Act of 1988.

61.   The 1988 Amendments aimed to ensure that data was "independently verified before any adverse action c[ould] be taken" against individuals and that "individuals . . . [were] given notice and an opportunity to contest any findings resulting from a computer match."  To effectuate these goals, the law sets forth concrete procedural requirements that must be taken before an agency can render a federal benefits decision utilizing certain data.

62.   These procedural requirements apply to "Matching Programs."  The Act defines a "Matching Program" as "any computerized comparison of two or more automated systems of records . . . for the purpose of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs."  5 U.S.C. § 552a(a)(8)(A).

63.   "Federal benefit programs" include "payments, grants, loans, or loan guarantees to individuals."  § 552a(12).

64.   A "Matching Program" does not include "matches performed to produce aggregate statistical data without any personal identifiers." 5 U.S.C. § 552a(a)(8)(B).  However, "to qualify under this exclusion, no information resulting from the match may be produced or retained in individually identifiable form or may be used in any way to affect the rights, benefits, or privileges of any individual." House Comm. on Government Operations, Report 100-802 (July 27, 1988); 54 Fed. Reg. 25,818, 25,823 (June 19, 1989).

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

65.     Matching Programs are subject to several procedural requirements, including the following, 5 U.S.C. § 552a(o-p & r-u):

a.  The agencies involved in the matching program must have entered into a written agreement specifying the purpose, legal authority, and cost savings of the matching program;

b.  The executive department must inform applicants for a federal benefit that matching programs may be used in verifying their applications;

c.  The agency must notify individuals that they have the right to contest the agency's findings from the matching program before the agency takes any adverse action; and,

d.  The agency must report any new or revised matching program to the House Committee on Government Operations, the Senate Committee on Governmental Affairs, and the Office of Management & Budget.

66.     Irrespective of whether it is utilizing a Matching Program, the Privacy Act also requires agencies to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2).

67.     The Privacy Act further mandates that Departments "inform each individual whom it asks to supply information, on the form which it uses to collect the information . . . the principal purpose or purposes for which the information is intended to be used." § 552a(e)(3).

68.     For disclosures not involving Matching Programs, the Privacy Act also limits when a Department may disclose information for "routine use." § 552a(b)(3).  "Routine use" means "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." § 552a(a)(7).  The law imposes three key requirements on routine use.  First, the Department must publish in the Federal Register "each routine use

13

of the records contained in the system, including the categories of users and the purpose of such use." §552a(e)(4)(D).  Second, the actual use of the materials must be "compatible" with the purpose for which it was collected. § 552a(a)(7). Third, there must be actual notice of the routine use at the time the Department collects the information from the individual. § 552a(e)(3)(C).

**FACTUAL ALLEGATIONS**

### ***Plaintiff's Federal Student Loans***

69.    Plaintiff attended Everest College-Ontario Metro, in Ontario, California ("Everest") in two time periods between 2007 and 2011.

70.    Everest was operated by Corinthian Colleges, Inc. ("Corinthian").

71.    Beginning in April 2007, Plaintiff attended Everest and received a Paralegal Associate Degree in April 2009.

72.    Between April 2010 until approximately July 2012, Plaintiff attended Everest's Criminal Justice Bachelor's Degree program, which she did not complete.

73.    Plaintiff borrowed FFEL and Direct loans to pay for her attendance at Everest College-Ontario Metro, in Ontario, California ("Everest"). In addition, she borrowed private student loans and drew Pell Grants to pay for her attendance at Everest.

74.    In total, Plaintiff borrowed seven FFEL loans and six Direct loans to attend Everest.

    a.  On May 18, 2007, Plaintiff borrowed three loans from College Loan Corporation ("CLC loans"), under the FFEL program. The loan amounts at the time of disbursement totaled $7500 and were used to pay for Plaintiff's attendance in the Paralegal program;

    b.  On January 11, 2008, Plaintiff borrowed two loans from a private lender under the FFEL program, purchased by the Department under

14

the 2007-2008 Short-Term Purchase Program ("STPP Loans").[3] The loan amounts at the time of disbursement totaled $7701 and were used to pay for Plaintiff's attendance in the Paralegal program;

c. On December 1, 2008, Plaintiff borrowed two loans from a private lender under the FFEL program, purchased by the Department under the 2008-2009 Loan Purchase Commitment (Put) Program ("LPCP Loans").[4] The loan amounts at the time of disbursement totaled $7321 and were used to pay for Plaintiff's attendance in the Paralegal program;

d. Between June 18, 2010 and November 17, 2011, Plaintiff borrowed six Direct Loans from the Department ("Direct Loans"). The loan amounts at the time of disbursement totaled $25,463 and were used to pay for Plaintiff's attendance in the Criminal Justice Program.

75.    In total, Plaintiff borrowed $22,521 in FFEL loans, $25,463 in Direct loans, and over $20,000 in private student loans to pay for her attendance at Everest. Plaintiff used over $24,000 in Pell grants to attend Everest.

### *Everest's Illegal Conduct*

76.    When she first enrolled at Everest in 2007, Plaintiff was going through divorce proceedings and had stayed home to raise her four children.

77.    She had learned about Everest from a brochure she received in the mail that advertised a flexible schedule and high job placement rates.

78.    Plaintiff was attracted to attending Everest because she needed a means to support herself and her children. Plaintiff believed she could start work as a paralegal while her children were school-aged and then go to law school.

---

[3] This program was authorized by the Ensuring Continued Access to Student Loan Act ("ECASLA"), Public Law 110-227, adopted to ensure liquidity in the student loan market in the face of financial disruption.

[4] *See* 73 Fed. Reg. 37423-37451 (July 1, 2008) (terms and conditions of purchase).

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

79.    At some point in the spring of 2007, Plaintiff met with an Everest admissions officer named Gabriela Padilla, who painted a "beautiful picture" of what Everest would be like and "how great" Plaintiff's life would be after she attended.

80.    Ms. Padilla told Plaintiff that her idea of completing the paralegal program and working as a paralegal while her children were in school and then going to law school after they were grown was a good plan.

81.    Ms. Padilla told Plaintiff that the Paralegal Associate's Degree was a great "stepping stone" towards practicing law, and that it would be easy for her to go to law school after becoming a paralegal.

82.    Ms. Padilla also told Plaintiff that all of her credits from Everest would be transferable to schools inside and outside of California, including the University of La Verne College of Law.

83.    According to Ms. Padilla, Everest's paralegal program was an "ABA-approved program" and that Everest was "nationally and regionally accredited."

84.    Ms. Padilla additionally told Plaintiff that Everest's flexible schedule would work well for Plaintiff as a single mother and that Everest was in the process of adding an on-campus daycare center to make it easier for parents to attend.

85.    As for the program itself, Ms. Padilla told Plaintiff that the instructors for the paralegal program were all practicing attorneys who were not only "book smart," but also had personal experience in the field and could provide "hands-on" training.

86.    Regarding career prospects, Ms. Padilla told Plaintiff that Everest would help her find a paralegal position after graduation, that 90% of students from the program obtained jobs in the legal field, that Everest was well connected in the local legal community, and that students from the program "were in very high demand from local employers."

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

87.     Specifically, Ms. Padilla told Plaintiff that attorneys liked the ability to "mold" paralegals who graduated from Everest, because they did not have bad habits from previous jobs, and that employers would "go after" her as an Everest graduate.

88.     According to Ms. Padilla, the starting salary as an entry-level paralegal would be at least $55,000 per year.

89.     An Everest financial aid counselor filled out a federal financial aid application for Plaintiff and instructed her to sign it.

90.     This financial aid counselor told Plaintiff that the Paralegal Associate's Degree would cost about $5,000 after her financial aid grants were applied and that Plaintiff would be able to pay off her student loans very quickly.

91.     When she decided to sign up for the paralegal program, Plaintiff believed that Everest was a "good deal."

92.     Plaintiff believed that if Everest was funded by the federal government, it was a legitimate school that would not lie to her.

93.     She was excited at the prospect of a successful career in the legal field and signed the loan documents, although she did not fully understand them.

94.     Everest staff did not provide Plaintiff with a choice of lenders, but gave her a form that listed College Loan Corporation in pre-printed type.

95.     On April 19, 2007, Plaintiff signed a Master Promissory Note for her FFEL loans from the College Loan Corporation.

96.     Once she was enrolled at Everest, Plaintiff earned a 4.0 GPA her first summer, earned a President's List certificate, and graduated on the honor roll.

97.     The actual program, however, was not consistent with the promised descriptions – the classes consisted of reading, doing workbooks, and watching "Law and Order" episodes.

98.     The most "hands-on" experience was walking around a local law library, and none of the instructors were attorneys.

17

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

99.     After Plaintiff began classes, the Everest financial aid office did not tell her the exact amount she had borrowed, and she never knew what loans she had obtained while she was in the paralegal program.

100.    At one point, Everest employees pulled Plaintiff from class and called her to the financial aid office.

101.    There, the Everest employees asked Plaintiff to log in to her financial aid portal and then told her to leave the office without signing out.

102.    Unbeknownst to Plaintiff, the Everest employees then enrolled Plaintiff in more student loans without her consent.

103.    The Everest career services office did not help Plaintiff find a paralegal internship.

104.    Plaintiff applied for internships on her own initiative, and eventually found an unpaid internship at the Family Law Facilitator's Office in the San Bernardino Superior Court.

105.    Although Plaintiff started her internship, she did not finish it because she could not afford to pay for childcare and work without pay.

106.    After Plaintiff graduated from the paralegal program, Everest did not help her in her job search.

107.    When she asked for assistance, Everest employees gave her copies of craigslist advertisements.

108.    Without any assistance from Everest, Plaintiff set up and attended over twenty paralegal job interviews, but did not receive a single callback interview.

109.    Upon learning that Plaintiff went to Everest, interviewers became visibly less interested.

110.    The law firms Plaintiff spoke with did not acknowledge her Everest paralegal degree, and big law firms were the least interested in hiring her.

111.    Plaintiff looked for a paralegal job on her own for almost a year.

18

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

112.    Plaintiff also began looking into transferring her Everest credits to another school to start a law degree.

113.    In the summer of 2009, Plaintiff briefly attended a psychology and criminal justice program at Argosy University. She started this program when she realized that finding a paralegal job would be difficult.

114.    She had to drop out of the Argosy program, however, because Argosy told her that Everest had used up her financial aid and she could not afford to pay the tuition without assistance.

115.    Argosy would not accept most of Plaintiff's Everest credits, but suggested to Plaintiff that she return to Everest because Everest would accept her credits.

116.    Less than a year after she graduated from the paralegal program, Plaintiff spoke with an Everest representative about her trouble finding a paralegal job.

117.    The representative told her "[a]n associate's degree is like a high school degree these days. It is just so common," and that a bachelor's degree was worth more than an associate's degree.

118.    The representative suggested that Plaintiff obtain a bachelor's degree in Criminal Justice from Everest, which would provide her with more opportunities and allow her to go into criminal law, telling her that "[w]ith two degrees, you'll be way ahead and in high demand."

119.    The representative also told Plaintiff that the Criminal Justice Bachelor's Degree program ("the criminal justice program") would be hands-on, with "real-life" scenarios involving crime scenes and mock investigations.

120.    As for the practicality of enrolling in the criminal justice program, the representative told Plaintiff that many of the courses from her paralegal degree would count towards the prerequisites of the bachelor's degree, and that it would only take her a year and a half to finish the bachelor's degree.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

121.   The brochure for the criminal justice program listed favorable job placement rates that Plaintiff ultimately found convincing.

122.   When Plaintiff began discussions with the Everest financial aid office about financing the bachelor's degree, the Everest representatives told her she qualified for a new set of Pell grants, and that the criminal justice program would cost half the amount of the paralegal program because she had already completed many of the prerequisites through her associate's degree.

123.   At the time, Plaintiff was desperate to find a job and anxious about her loans.

124.   She also wanted to attend law school, as she had originally planned.

125.   As other schools would not accept the Everest credits, Plaintiff decided to re-enroll at Everest in the criminal justice program.

126.   While Plaintiff was enrolled in the criminal justice program, Everest financial aid staff pulled her out of class at the end of the term to sign into the student portal and signed her up for more loans without her knowledge.

127.   After Plaintiff completed three terms in the criminal justice program, an Everest administrator told her that the school had made an "oversight" about the prerequisites, and that she would be required to attend for another term.

128.   Although Plaintiff was frustrated at the mistake, she agreed to complete one more term.

129.   After the next term, the administrator told her there was another mistake and that she was required to take classes for an additional term.

130.   At this point, Plaintiff realized that Everest was "playing her for a fool," and called Denise Greco, the campus dean, to complain.

131.   Ms. Greco responded by telling Plaintiff not to give up because she was "almost there."

132.   Plaintiff was exhausted and angry, as she had been raising her children and going to school for four years, and had "nothing to show for it."

133.   She withdrew from the criminal justice program in approximately July 2012.

134.   After withdrawing, she never heard from Everest again, and she continued to look for jobs in the paralegal and criminal justice fields without success.

135.   Plaintiff never found employment in the legal field.

136.   Plaintiff first learned the full extent of her student loans in 2012 when she tried to buy a car. She was shocked.

137.   As a result of the student debt she incurred from attending Everest, she has not been able to obtain funding to pursue further education and cannot afford further schooling.

138.   Everest has "shattered" her career goals, as her course credits from Everest are essentially useless.

139.   Plaintiff obtained no financial value from attending Everest.

140.   She spent the first four years of her youngest daughter's life away from her daughter, pursuing an education that she was led to believe would provide stability for her family.

141.   If the true nature and value of Everest had been accurately described to her, Plaintiff would not have enrolled at all.

142.   By November 2016, Plaintiff's student debt from Everest, including her federal and private loans, totaled almost $100,000.

143.   Her inability to repay these student loans has harmed her consumer credit rating, resulted in her only qualifying for a "high risk" loan for a car, and causes her constant stress.  This is particularly problematic because Plaintiff is highly dependent on her car to perform her job-related duties.

144.   Plaintiff eventually was able to find employment as a full-time home healthcare phlebotomist, a job totally unrelated to her studies at Everest.

21

Generally, there are no mandatory education requirements for an individual to be employed as a healthcare phlebotomist.

### ***Plaintiff's Attempts to Have Her Debt Determined Legally Unenforceable***

145.   In March 2015, Plaintiff submitted an application to the Department for complete cancellation of all of her federal student loans from Everest.

146.   Plaintiff's application was based on the misconduct she experienced at Everest, and the "borrower defense" or "defense to repayment" provisions of Department regulations and the terms of her MPN.

147.   At the time, the Department did not have any form or process for receiving borrower defense claims. Plaintiff utilized a web-based form created by the Debt Collective, an advocacy organization.

148.   She filled out the form without the assistance of a lawyer. She detailed misrepresentations made by Everest representatives about job placement assistance, job placement rates, expected salaries, job prospects, accreditation and transferability of credits, and the cost of the programs.

149.   She described the injury caused by these misrepresentations and her attendance at Everest, including the fact that her credits will not transfer, she has over $100,000 of student loan debt and no job related to her studies, and she is not eligible for further financial aid because she used it up attending Everest. In addition, she stated:

> I am always so stressed out because of this debt. I spent almost 4 years of my life away from my kids and family for nothing. I sacrificed the first 4 years of my daughters [sic] life to better myself well so I thought, I am so far in debt with student loans I can't even have a normal car loan. I have to have a high risk loan because the student loans have destroyed my credit. I will never make the money they claimed I would to pay this debt off I can never buy a home for my children. I feel they trapped me. It makes me sick to think I thought I

> was bettering my life that one day I would live the
> American dream to own a home have a great job
> that I love. Be able to pay for children's college.
> But that is not how it turned out at all.

150.   She asserted that the conduct violated California law, including the

Unfair Competition Law, the False Advertising Law, and the Consumer Legal

Remedies Act.

151.   Pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), and

Master Promissory Note (MPN) under the William D. Ford Federal Direct Loan

(Direct Loan) Program and Federal Family Education Loan (FFEL) Program,

Plaintiff requested relief in the form of cancellation of all remaining principal,

interest, fees and costs associated her loans; cessation of all collection actions;

return of any sums paid; removal of adverse credit reporting; and restoration of

eligibility for federal student aid.

152.   While awaiting a response to her application, Plaintiff defaulted on

her CLC loans, in approximately August 2015.

153.   ECMC, the guaranty agency holding the CLC loans sent Plaintiff a

notice, dated August 15, 2016, alerting her that it intended to offset her federal

income tax refund in service of her defaulted FFEL loans, under the Treasury

Offset Program ("TOP").

154.   On October 18, 2016, through counsel, Plaintiff submitted a timely

objection to the proposed TOP offset and a request for a hearing to ECMC.

155.   Plaintiff objected to offset on the grounds that her loans are not legally

enforceable because of misconduct committed by Everest in violation of California

law.

156.   On October 19, 2016, ECMC sent Plaintiff a notice of intent to

garnish her wages in order to collect the CLC loans.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

157.   On November 2, 2016, through counsel, Plaintiff submitted a timely objection to the proposed wage garnishment to ECMC and requested an in-person hearing to present her evidence.

158.   Plaintiff objected to wage garnishment on the grounds that her loans are not legally enforceable because of misconduct committed by Everest in violation of California law, specifically California's Consumers Legal Remedies Act, Unfair Competition Law, and the common-law doctrines of negligent misrepresentation and fraud.

159.   As Defendant has acknowledged in this litigation, that objection constituted a borrower defense to the repayment of her loan.  The Defendant had an obligation to consider the borrower defense application when evaluating the enforceability of her loans.

160.   The objection and request for hearing included a 29-page letter explaining why Plaintiff's loans are not legally enforceable and 254 pages of exhibits, including a sworn statement from Plaintiff, records, and evidence from the Attorney General of California regarding documented misconduct on the part of Everest and its parent company, Corinthian Colleges, Inc., in violation of California state law.

161.   Her legal enforceability objection provided evidence of the facts alleged in paragraphs 76 through 144 of this complaint.

162.   Also detailed in her submission, Plaintiff raised these illegal acts as a defense to repayment of her loans under the plain terms of her MPNs and Department regulations, *see* 20 U.S.C. §§ 1082(a)(5)-(6), 1087e(h); 34 C.F.R. §§ 30.70, 682.209(g); 34 C.F.R. § 685.206(c).

163.   As the Department still did not have any form for borrowers to use to submit a borrower defense application, Plaintiff included in her submission certain basic information the Department had suggested each borrower should provide with a borrower defense application.

24

164.   On November 18, 2016, through counsel, Plaintiff learned that ECMC had certified her loans for offset under TOP, notwithstanding her timely objection and request for hearing.

165.   On this same date, through counsel, Plaintiff learned that ECMC had placed a hold on the proposed wage garnishment pending resolution of her objection, and that ECMC had forwarded Plaintiff's objection to the Department for adjudication.

166.   On December 15, 2016, Plaintiff learned, through counsel, that ECMC had halted the TOP offset. ECMC advised that it would not adjudicate the enforceability of Plaintiff's loans, because only the Department could make that determination.

167.   On this same date, ECMC confirmed that it had forwarded Plaintiff's objection, request for hearing, and supporting materials to the Department for adjudication.

168.   In late December 2016, Plaintiff completed and submitted to the Department an "attestation form" asserting her complete defense to repayment of her Direct Loans.

169.   This form was designed by the Department specifically for use by individuals who borrowed student loans in order to attend a program at a school operated by Corinthian Colleges during a certain period of time, because the Department determined that Corinthian had misrepresented its job placement rates to prospective students during those times, for those programs.

170.   The Department had designated those who enrolled in the Criminal Justice Bachelor Degree program at Everest Ontario between July 1, 2010 and September 30, 2014 as eligible for complete loan cancellation upon submission of the attestation form.

171.   Plaintiff has not received any acknowledgment that this attestation form was received or processed.

172.   On January 30, 2017, the Secretary sent Plaintiff, through counsel, a letter denying her objection to administrative wage garnishment.

173.   The letter is titled "Administrative Wage Garnishment Hearing Decision," and states:

> This letter is to present the findings of the recent written records hearing requested by you on behalf of your client [sic] objection to collection of a defaulted student loan account held by the Educational Management Corporation (ECMC) through wage garnishment action. This decision was rendered by the U.S. Department of Education (the Department) after careful review of your arguments and all available record related to your client's account, including those submitted by you and those maintained by ECMC. These findings are conclusive and represent the Department's final decision on your client [sic] objections. If you disagree with this decision, you may have this decision reviewed by bringing a lawsuit in Federal District Court.

174.   The Wage Garnishment Decision identifies "File documents provided by ECMC" as the "Evidence Considered" by the Secretary.

175.   The "Decision" is that "[t]he Department has determined that your client's account is subject to collection through administrative wage garnishment (AWG) at 15% of your disposable pay."

176.   The "Reason for Decision" is stated in the letter, in its entirety, as:

> Your client objected that she believe [sic] that her loans are not an enforceable debts [sic]. *On November 14, 2016, ECMC explained to you and your client why these loans were enforceable and they had addressed your concerns and enclosed copy of the borrower's promissory notes.* Because ECMC holds the promissory note(s) and other and other [sic] records supporting the existence of the debt, the borrower has the burden to prove that the debt is not owed. The Promissory note that forms

26

the basis of this debt is a contract between the borrower and the lender, and any subsequent holder of the promissory note. Please have the borrower establish a repayment arrangement to avoid the possibility of wage garnishment with ECMC's Internal Collection Department at 800-367-1589, whereas the Department finds that the borrower [sic] student loan debt is still legally enforceable; therefore the borrower objection is denied. (emphasis added).

177.    ECMC was copied on this letter.

178.    On or about February 13, 2017, ECMC sent a letter to Plaintiff's employer, IPPG, directing the employer to begin garnishing 15% of Plaintiff's wages.

179.    On information and belief, on or before February 17, 2017, IPPG instructed its third-party payroll administrator to garnish Plaintiff's wages, effective immediately.

180.    On February 23, 2017, Plaintiff filed suit, along with an *ex parte* application for a temporary restraining order directing the Secretary to notify ECMC and her employer that the wage garnishment order is withdrawn, and restraining the Secretary from permitting or authorizing ECMC or its agents to enforce any order to withhold Plaintiff's wages.

181.    Plaintiff sought a court order because she lived paycheck to paycheck, had $68 in her bank account, no familial support, and even a single garnishment would leave her unable to meet her family's basic necessities.

182.    On March 2, 2017, the Parties stipulated to a stay of garnishment pending litigation, "agreeing that the garnishment will remain suspended until final judgment is rendered in this civil action."

183.    In conjunction with the stipulation, the Secretary directed ECMC to send notice to Plaintiff's employer to suspend garnishment. The notice stated:

The Order of Withholding from Earnings (the

27

> order) previously sent to you does not expire. The Order continues to exist on this individual; however we request that you suspend garnishment of their wages until further notice. ECMC will notify you in writing when to remove the suspension and resume garnishing the employee's wages.

184.   On May 8, 2017, the Secretary filed a motion for voluntary remand so that she could "reconsider and re-issue," the January 2017 decision that Plaintiff's loans are enforceable. The Secretary agreed that the suspension of wage garnishment would continue pending reconsideration.

185.   The Secretary claimed that she needed to reconsider the January 2017 Decision because Plaintiff was "challenging [the enforceability of her loans] in a separate DOE proceeding," that "remain[ed] pending" before "a separate DOE entity pursuant to different regulations."

186.   Whereas, the Secretary maintained, the January 2017 decision "cannot supplant this pending decision," it "should include a determination of whether the debt has been discharged pursuant to a separate DOE proceeding."

187.   Plaintiff opposed such remand, as the suspension of garnishment did not abate the harm she experiences as a result of her student loan debt, and the proposed remand represented only further delay and harm, and the Secretary promised only to consider the evidence submitted in March 2015, not the evidence considered and rejected in January 2017.

188.   In the alternative, Plaintiff requested that the Court remand with a direction that the Secretary, among other things, consider the evidence Plaintiff submitted in her objection to AWG on grounds of legal enforceability, and that the Court retain jurisdiction to review any decision following remand.

189.   On June 8, 2017, the Court denied the Defendant's motion for remand, finding no "substantial or legitimate concern guiding [the] request for a remand," and concluding that the request appeared to be a "frivolous," "bad faith" "attempt to evade judicial review."

190.   Seven days later, on June 15, 2017, the Secretary issued an "Interim Decision" purporting to "withdraw" the Secretary's Wage Garnishment Decision because that decision did not consider Plaintiff's March 2015 borrower defense application.

191.   The Interim Decision states that the CLC loans had been assigned to the Department, and that the Department would issue a final administrative wage garnishment decision as soon as its consideration of the March 2015 application was complete. Further, according to the Interim Decision, "[n]o wage garnishment on these loans will be initiated until the review of your client's borrower defense application is complete."

192.   On September 7, 2017, the Secretary notified the Court of the June Interim Decision, and further that she intended to make a decision on Plaintiff's March 2015 application on or before March 1, 2018 "as part of a larger group of decisions being issued regarding similar claims."  Acting Under Secretary of the Department indicated that "ED [was] currently in the process of adjudicating [] Borrower Defense Discharge claims" and was "evaluating criteria for Borrower Defense relief for claims similar to that of Ms. Dieffenbacher."

193.   The Court, noting that its subject matter jurisdiction was predicated on the January 2017 final agency decision, ordered the parties to show cause why the Court maintained jurisdiction notwithstanding the Interim Decision purporting to withdraw the January 2017 decision.

194.   After considering the parties' timely filed briefs, the Court vacated the order to show cause and ordered the Secretary to answer the Complaint challenging the January 2017 decision.

195.   The Secretary filed her Answer on November 20, 2017, admitting that Plaintiff's objection to the wage garnishment on the grounds of legal enforceability was a borrower defense application, and that Plaintiff had submitted a 29-page

letter and 254 pages of exhibits explaining why her loans are not legally enforceable.

### *February 28, 2018 Borrower Defense "Adjudication"*

196.   On February 28, 2018, the Secretary mailed Plaintiff a "Borrower Defense Claim – Adjudication Notice."

197.   This Adjudication Notice states that the Department has "determined that you are entitled to forgiveness of the loans associated with your enrollment at Corinthian Colleges, Inc. ("CCI") based on the school's material misrepresentation(s) to you," under 34 C.F.R. § 685.206(c). Further,

> The amount of loan relief that you will receive is based on the Department's assessment of the value of the education that you received. The Department has determined the value of your education by comparing the average earnings of students who attended your program(s) of study to the average earnings of students who graduated from similar programs at other schools that adequately prepare students for gainful employment.

198.   The Adjudication Notice further states "Accordingly, based on your enrollments in the Criminal Justice (Bachelor) and Paralegal (Associate) programs, 50% of the Federal Student Aid loans you received from the programs of study related to your approved claim are eligible for discharge (forgiveness)."

### *The Department's Irrational Use of Third-Party Data to Calculate Relief*

199.   To make this determination, the Department separated the question of whether Plaintiff established a borrower defense and the question of what consequences follow from that conclusion.  Specifically, after concluding that Ms. Dieffenbacher was entitled to borrower defense relief, it compared the average earnings of Corinthian borrowers from 2014 with a pending borrower defense application as of July 31, 2017, with data from borrowers at "peer" schools with a "passing gainful employment (GE) program."

30

200.   Based on this data adventure, and contrary to the language of the regulation, the Department adopted the following tiers to determine the amount of borrower defense relief for individual applicants:

| CCI Earnings as a Percentage of GE Earnings | Amount of Relief |
|---|---|
| 1% to 49% | 100% |
| 50% to 59% | 50% |
| 60% to 69% | 40% |
| 70% to 79% | 30% |
| 80% to 89% | 20% |
| 90% and above | 10% |

201.   For Ms. Dieffenbacher, a group of Corinthian students from one of her programs (it is not clear which) purportedly had average earnings in 2014 between 50% and 59% of students at some peer schools that passed Gainful Employment.

202.   The Department has not explained how this determination comports with the evidence that Ms. Dieffenbacher submitted in 2015 and/or 2016, or whether that evidence was even considered.

203.   The Department does not claim that its determination of relief was made in accordance with California law.

204.   And, the Department never informed Ms. Dieffenbacher that information related to average earnings and/or the "value" of her experience would be relevant to the borrower defense adjudication.

205.   This process did not take into account Ms. Dieffenbacher's field of employment or area of study.  As the Department itself has noted, "if a borrower attends a nursing program, but couldn't find a nursing job and ended up in another field, the department has no way of knowing that."

206.   Further, the process of choosing comparator "peer schools," did not take into account the debt that students from other schools maintain.  That is, a

31

school can "pass" the Gainful Employment metric irrespective of its students' earnings, and thus a student from a "peer" school with lower income may not be saddled with the same debt as a Corinthian borrower.

### *The Department's Unlawful Data Experiment*

207.   In order to obtain the data to engage in this experiment, the Department relied on an unrelated Gainful Employment Information Exchange Agreement with the SSA.  This Agreement was designed to "provid[e] aggregate disclosures of earnings information to the public to assist them in evaluating institutions that participate in the federal student aid programs."  In other words, the information obtained from the Agreement would allow the public to evaluate the legitimacy of various institutions. Under this Gainful Employment agreement, the Department provided the SSA with the names, dates of births, social security numbers, and a requested earnings report year for students, and SSA "extract[s] their earnings data . . . and compute[s] aggregate earnings data by specific group as provided by ED for the requested earnings report year."  SSA then sent the Department aggregated data without identifying information.

208.   The Department used this Agreement to send the SSA personal data from 61,717 Corinthian borrowers, including, upon information and belief, Ms. Diffenbacher.  The Department's disclosure of personal information of applicants for borrower defense to SSA was not for the purpose of calculating gainful employment rates, and the groupings of students are different than the groupings required by that regulation.  The SSA then sent back aggregated average income data from 2014 for Corinthian students in specific programs and students at the "peer" school.

209.   The Department has not released the underlying data that it is relying upon for this *ultra vires* endeavor.  Nor is there information available that would permit a borrower to verify: whether the income data that the Department considered is accurate; whether the individuals selected to be included in the data

32

actually attended specific programs; whether the student data considered from the "peer schools" is accurate; or, whether the "peer" schools are actually appropriate comparators.

210.   The Department lacks an information sharing agreement that specifically allows for the SSA's data to be utilized for this purpose.

211.   The Department has taken this action without disclosing the program to the House Committee on Government Operations, the Senate Committee on Governmental Affairs, or the Office of Management and Budget.

212.   The Department has determined Ms. Dieffenbacher's borrower defense claim without obtaining current data directly from her.  And the Department never informed Ms. Dieffenbacher (or the 61,717 borrower defense applicants) that personal information would be used in this manner.

### *The Department's Insufficient Notice and Problems with Consolidation*

213.   The Department's borrower defense adjudication notice states, without any guarantees, that "the Department will take steps to reduce the amount of interest that has accrue on your loan(s) from the time you submitted your claim."

214.   The Department's notice does not inform Ms. Dieffenbacher that she has a right to appeal the determination by filing a lawsuit in U.S. District Court. It instead states: "If you have any questions about this notice, please contact the Department of Education at FSAOperations@ed.gov or at 1-855-279-6207."  Upon information and belief, this email address is no longer functional.

215.   The Notice states that it covers both Plaintiff's Direct and FFEL loans.

216.   A declaration filed in this case by a Department official states that the determination was based on Plaintiff's March 2015 application.

217.   With respect to Plaintiff's Direct loans, the Notice provides, "The Department will direct your loan servicer to discharge 50% of the Direct loans

relating to your claim. The forgiveness should be completed within the next 90-120 days."

218.   As of the filing of this complaint, the total amount due on Plaintiff's Direct Loans is $15,843 (including principal and interest), as compared to $ 34,128, the total amount of interest and principal owed as of October 2016. Plaintiff's standard monthly payment on her Direct Loans is $ 176.22.

219.   The status of her Direct Loans, as of the filing of this complaint, is "in repayment," effective March 13, 2018, and payment is due on the 28th of each month.

220.   With respect to Plaintiff's FFEL loans, the notice states:

> In order to receive loan forgiveness related to the outstanding balance of your FFEL loans, you must first consolidate those loans into a Direct Consolidation Loan. The Department cannot forgive your FFEL loans until you consolidate them. . . . If all of the loans included in your Direct Consolidation Loan are eligible for discharge, the Department will discharge your FFEL loan(s) so that you receive a 50% discharge of your FFEL balance.

221.   The Adjudication Notice does not explain how Plaintiff can consolidate her FFEL loans notwithstanding the prohibition on consolidation of federal student loans subject to a garnishment order. *See* 34 C.F.R. § 685.220(d)(1)(ii)(C).

222.   The Adjudication Notice does not place any time limitation on Plaintiff's ability to consolidate her FFEL loans in order to receive 50% cancellation.

223.   As of the filing of this complaint, Plaintiff has not consolidated her FFEL loans by applying for and agreeing to pay a Direct Consolidation Loan.

224.   The Federal Direct Consolidation Loan Application and Master Promissory Note requires a borrower to certify that, "If I consolidate my loans, I

34

may no longer be eligible for . . . certain types of loan discharges or loan forgiveness . . . that were available on the loans I am consolidating."

225.   In 2010, the Department denied a borrower's defense to repayment on the grounds that the underlying loan had been consolidated:

> In order to succeed on his or her defense to repayment, a borrower must show that the school committed an act or omission that would give rise to a cause of action under applicable State law. The Department has explained that it will only recognize such claims as a defense against repayment if the school's act or omission has a clear, direct relationship to receipt or distribution of the loan or to the school's provision of educational services for which the loan was provided. A Direct Consolidation Loan is different from a Direct Stafford or PLUS loan, because it was not disbursed to allow a borrower to attend a school. A Direct Consolidation Loan simply pays off other loans. No clear, direct relationship exists between a school's act or omission and the receipt or distribution of the Direct Consolidation Loan. Similarly, there is no relationship between a school's act or omission and the school's provision of services for which the Direct Consolidation Loan was provided, as the Direct Consolidation Loan was not used to pay for services from the school.

226.   As of the filing of this complaint, the total amount due on Plaintiff's FFEL loans is $35,679 (including principal and interest), as compared to $32,976 as of October 2016.  Plaintiff's monthly payment on her FFEL loans is $ 264.45.

227.   As of the filing of this complaint, Plaintiff has been unable to make timely payments on her monthly loans. In total, her total monthly payment for all of her loans (including past due amounts and loans unrelated to her Corinthian programs) is $ 2,002.23

35

228.   The status of Plaintiff's LCPC and STPP FFEL loans is "in repayment," effective April 29, 2016, and payment is due on the 28th of each month.

229.   The status of Plaintiff's CLC FFEL loans is "defaulted, unresolved," effective June 15, 2017.   These loans are serviced by the Department's Debt Management and Collections System.

230.   As a result of the February 28, 2018 Adjudication Notice, Plaintiff's Direct Loans are 50% enforceable, whereas her FFEL loans remain 100% enforceable.

231.   As of the filing of this complaint, the Secretary has not issued a final administrative wage garnishment decision following the resolution of the March 2015 borrower defense application.

## CAUSES OF ACTION

## <u>Count 1</u>

## Arbitrary, Capricious, and Unlawful Borrower Defense Adjudication Decision—APA § 706(2)

232.   Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

233.   Plaintiff asks this Court to exercise review over, and set aside the Secretary's Borrower Defense Adjudication Notice pursuant to the Administrative Procedure Act.

234.   The Secretary's Adjudication Notice constitutes a final agency action reviewable under the Administrative Procedure Act.

235.   The Secretary incorrectly concludes, as a matter of law, that it can continue to collect 50% of Plaintiff's loans, notwithstanding Plaintiff's valid borrower defense to repayment of these loans.

236.   The Secretary applied the wrong legal standard in adjudicating Plaintiff's borrower defense claims. The Secretary based her review on whether

Corinthian had made "material misrepresentation(s)" to Plaintiff, rather than whether "any act or omission of the school attended by [Plaintiff] . . . would give rise to a cause of action against the school under applicable State law."

237. The Secretary disregarded evidence presented by Plaintiff in 2015-2017 demonstrating that under California law, she would be entitled to damages amounting to at least her total federal student loan balance as a result of Corinthian's misconduct, and that these damages are not subject to offset because Plaintiff received negligible value from attending Everest.

238. The Secretary failed to make an individualized assessment of Plaintiff's harm and impermissibly relied upon "average earnings" of similarly situated borrowers in its Adjudication Notice.

239. The Secretary's determination that any of Plaintiff's debt remains legally enforceable is arbitrary, capricious, and contrary to law.

## Count 2

### Violation of Due Process—APA § 706(2) & U.S. Const., Amend. V

240. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

241. Plaintiff maintains a property interest in the outcome of her borrower defense application. This interest has been established by, without limitation, the statutory and regulatory standards entitling individuals to a borrower defense discharge and by Department statements and actions showing that individuals have a right to submit defense to repayment claims.

242. The Secretary violated Plaintiff's right to Due Process by failing to disclose the information on which the Adjudication Notice was based.

243. The Secretary violated Plaintiff's right to Due Process by ignoring evidence of injury submitted by Plaintiff and relying instead on third-party data that does not reflect Plaintiff's circumstances.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

244. The Secretary violated Plaintiff's right to Due Process by failing to recognize Plaintiff's right to appeal the Borrower Defense Adjudication

245. These violations of Due Process render the Adjudication Notice arbitrary, capricious, and contrary to law.

## Count 3

### Violation of Privacy Act -- APA § 706(2) & 5 U.S.C. § 552a

246. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

247. Defendants have violated the APA, 5 U.S.C. § 706(2), because they rendered a decision about Plaintiff's borrower defense applications in violation of the Privacy Act's restrictions on Matching Programs.

248. Defendants' data sharing program with the SSA is a "Matching Program" as that term is defined in the Privacy Act, 5 U.S.C. § 552a(a)(8)(A). The borrower defense application constitutes a "Federal benefit program" under the Privacy Act, 5 U.S.C. § 552a(a)(12).

249. The Department and the SSA utilize a computerized comparison of at least two automated systems of records: the department's information relating to the applicants and their program, and the SSA's information relating to the individual's income. Once the comparison is complete, the Department uses the data to determine whether a specific borrower defense applicant receives a full discharge of their federal student loans.

250. The Department has failed to comply with the Privacy Act's procedural requirements. It lacks a written agreement permitting a matching program for this purpose, it is not informing applicants that a matching program will be utilized for income or in this manner, it is not notifying individuals that they have the right to contest the agency's findings from the matching program before partially denying borrower defense claims, and the Department has not reported the Matching Program to the relevant oversight bodies.

251.   The Department processed Plaintiff's claim utilizing this Matching Program.

252.   The Department also violated the Privacy Act by failing to collect the information from Ms. Dieffenbacher when the information resulted in adverse determinations about her rights, benefits, and privileges under a Federal Benefit Program.

253.   The Department further violated the Privacy Act by failing to inform Ms. Dieffenbacher that her information would be shared for this purpose.

254.   Finally, the Department violated the Privacy Act because its disclosure did not constitute a routine use, because it was not used for the purposes for which it was collected.

255.   These violations of the Privacy Act render the adjudication arbitrary, capricious, and contrary to law.

## Count 4

### Arbitrary, Capricious, and Unlawful Wage Garnishment Decision—APA § 706(2)

256.   Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

257.   Plaintiff asks this Court to exercise review over, and set aside the Secretary's Wage Garnishment Decision, pursuant to the Administrative Procedure Act.

258.   The Wage Garnishment Decision constitutes a final agency action reviewable under the Administrative Procedure Act.

259.   In particular, in light of the Secretary's Borrower Defense Adjudication notice, the Wage Garnishment Decision, which concludes that Plaintiff's loans are legally enforceable and subject to garnishment, remains final and effective for the 50% of Plaintiff's loans that the Secretary intends to continue to collect.

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

260.   The Secretary issued its Wage Garnishment Decision without providing the oral hearing requested and required by Department regulations.

261.   The Secretary did not provide Plaintiff with an explanation of its decision sufficient to inform her of its rationale for denying the oral hearing and her objection to the garnishment on the ground that her loan is not legally enforceable.

262.   The Secretary did not consider, or if she did consider, did not explain her decision in reference to, the evidence that Plaintiff submitted regarding the legal enforceability of Plaintiff's debt.

263.   The Secretary's Wage Garnishment Decision was not rationally related to the evidence before the Secretary at the time of the decision.

264.   The Secretary's determination that Plaintiff's debt is legally enforceable and subject to collection through garnishment is arbitrary, capricious, and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C. § 2201, the Privacy Act, 5 U.S.C. § 552a, and the U.S. Const., Amend. V., Plaintiff respectfully requests that this Court enter a judgment and order for relief as follows:

A.   Finding that the Secretary's Borrower Defense Adjudication Notice violates the Administrative Procedure Act, Due Process Clause, and Privacy Act;

B.   Striking or setting aside the Secretary's Borrower Defense Adjudication Notice;

C.   Finding that the Secretary's final decision regarding the administrative wage garnishment of Plaintiff's debt violates the Administrative Procedure Act;

D.   Striking or setting aside the Secretary's final decision regarding

40

the administrative wage garnishment of Plaintiff's debt;

E.      Ordering the Secretary to withdraw authority for all forms of collection of Plaintiff's loans, including administrative garnishment of Plaintiff's wages;

F.      Declaring that Plaintiff's federal student loans from Corinthian are not legally enforceable in their entirety;

G.      Ordering the Secretary to pay the cost of this action, together with reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), as determined by the Court; and

H.      Granting such other and further relief as the Court may deem just and proper.


Dated: July 16, 2018


                                        Respectfully Submitted,


                                        /s Eileen M. Connor


                                        Eileen M. Connor
                                        Deanne B. Loonin
                                        Toby R. Merrill
                                        Joshua D. Rovenger

                                        LEGAL SERVICES CENTER OF
                                        HARVARD LAW SCHOOL
                                        122 Boylston Street
                                        Jamaica Plain, MA 02130
                                        Tel.: (617) 390-3003
                                        Fax: (617) 522-0715

                                        Robyn C. Smith

41

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]

1    LEGAL AID FOUNDATION OF
     LOS ANGELES
2    5228 Whittier Blvd.
     Los Angeles, CA 90022
3    Tel.: (213) 640-3906
     Fax: (213) 640-3911
4

5    *Attorneys for Plaintiff Sarah
     Dieffenbacher*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT [FOR DECLARATORY AND INJUNCTIVE RELIEF]